UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Samuel Hawk,<br>FCI Schuylkill<br>Federal Correctional Institution<br>Satellite Camp<br>Post Office Box 670<br>Minersville, Pennsylvania 17954<br><br>    Plaintiff,<br><br>  v.<br><br>Federal Bureau of Prisons,<br><br> Serve: Jeff Sessions<br>    Attorney General<br>     of the United States<br>    United States Department of Justice<br>    950 Pennsylvania Avenue, N.W.<br>    Washington, D.C. 20530<br><br>    and<br><br>    Jessie K. Liu<br>    United States Attorney<br>     for the District of Columbia<br>    Judiciary Center Building<br>    555 Fourth Street, N.W.<br>    Washington, D.C. 20530<br><br>    and<br><br>    Mark S. Inch<br>    Director<br>    Federal Bureau of Prisons<br>    320 First Street, N.W.<br>    Washington, D.C. 20534<br><br>    Defendant. | Civil Action No. 1:18-cv-00519 |

**COMPLAINT**

Plaintiff Samuel Hawk ("Mr. Hawk"), by his undersigned counsel, files this complaint against Defendant the Federal Bureau of Prisons ("BOP"), alleging as follows:

## I. INTRODUCTION

1. This lawsuit arises from BOP's willful violations of Section 504 of the Rehabilitation Act ("Rehabilitation Act") and the Religious Freedom Restoration Act ("RFRA"), by continuously and systematically failing to make reasonable accommodations for Samuel Hawk – a deaf inmate in BOP's custody at the U.S. Federal Bureau of Prisons' Federal Correctional Institution Schuylkill ("FCI Schuylkill") in Minersville, Pennsylvania – as required.

2. BOP's illegal and discriminatory conduct has deprived – and continues to deprive – Mr. Hawk of the ability to, *inter alia*, receive adequate and informed medical treatment, participate in prison meetings, effectively take part in any rehabilitative, educational, or religious programs, communicate with those within and outside the institution, and receive fair, equal, and safe treatment at the hands of the prison staff.

3. Accordingly, Mr. Hawk seeks the accommodations to which he is legally entitled and which BOP has refused to provide as well as damages to compensate him for BOP's past acts of deliberate and intentional discrimination towards Mr. Hawk which caused him to suffer a medical condition.

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law (Rehabilitation Act and RFRA).

5. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(e) because BOP resides in this district and a substantial part of the policy decisions giving rise to Mr. Hawk's claims occurred at BOP headquarters, which is located in this district.

DMEAST #33141225 v1

2

### III.   PARTIES

6. Plaintiff Samuel Hawk is a deaf inmate currently incarcerated at FCI Schuylkill and under the BOP's custody and control. Mr. Hawk is deaf and has been since birth.

7. Defendant BOP is the federal executive agency responsible for the management and regulation of all federal penal and correctional institutions. 18 U.S.C. § 4042(a)(1). The BOP is headquartered in Washington, DC. FCI Schuylkill, where Mr. Hawk is incarcerated, is a correctional facility controlled and operated by BOP.

### IV.   FACTS

8. Mr. Hawk is a deaf individual. He communicates primarily using American Sign Language ("ASL"), which he considers his native language. He requires a sign language interpreter to allow him to communicate effectively with persons who do not know ASL. Mr. Hawk's ability to read lips is limited. Furthermore, Mr. Hawk cannot use the telephone in the same way as a hearing person, and requires a videophone.

9. Mr. Hawk was admitted to FCI Schuylkill in February 2015.

10. During his almost three year incarceration at FCI Schuylkill, prison officials have failed to provide Mr. Hawk with even the most basic communication accommodations. The BOP has intentionally not furnished Mr. Hawk with qualified interpreters, appropriately trained prison staff, and effective auxiliary aids and services that were necessary to afford him an equal opportunity to participate in, and enjoy the benefits of, the services, programs, or activities at FCI Schuylkill.

11. As a direct result of BOP's intentional failure to fulfill its obligations under the Rehabilitation Act and the Religious Freedom Restoration Act, Mr. Hawk has been unable to obtain any real benefit from prison sponsored or prison approved events, including but not

limited to prison meetings, work assignments, and educational, recreational, vocational, and religious services, offered at FCI Schuylkill.

12. BOP's failure to accommodate Mr. Hawk has resulted in not only his depression, isolation, and stress but also a medical condition and related hospitalization on account of these emotional conditions and his continuous concern for his safety and wellbeing.

13. The BOP has failed to uphold its responsibilities under Rehabilitation Act and the RFRA, resulting in disability-based discrimination against Mr. Hawk at FCI Schuylkill on account of Mr. Hawk being:

- Unable to communicate effectively with health care providers and mental health professionals, raise medical issues, discuss mental health concerns, or understand the treatments and medications they prescribe;

- Excluded from participating in the same educational, vocational and rehabilitation classes and work programs as hearing prisoners;

- Deprived of knowledge or understanding of prison-wide safety and/or emergency announcements;

- Deprived of knowledge of prison meals, work assignments and other important daily prison activities;

- Unable to communicate effectively with correctional officers and prison staff;

- Unable to communicate effectively with those outside of FCI Schuylkill due to the lack of access to a videophone; and

- Subject to unsafe conditions due to correctional officers unawareness of his disability or failure to accommodate his disability in daily interactions with Mr. Hawk individually and in group settings.

14. Mr. Hawk officially informed BOP of its failure to provide proper and effective communication and the resulting problems by using BOP's administrative remedy process and through letters from his counsel. BOP denied Mr. Hawk's administrative remedy requests and his near-daily informal requests for auxiliary aids and services making this lawsuit necessary.

### A.     *Inadequate Access to Qualified Interpreters*

15.     Individuals in the custody of BOP are wholly dependent on BOP for medical, dental, educational, mental health, employment, religious, vocational services and programs. Individuals in the custody of BOP are also dependent on BOP and prison staff for all of their basic daily needs, including, but not limited to, food, exercise, and safety.

16.     For deaf individuals who rely on ASL as their primary form of communication, use of a qualified American Sign Language interpreter is necessary to ensure effective communication between a deaf individual and an individual who does not use ASL to communicate.

17.     A qualified sign language interpreter is necessary because ASL is a complete, complex language that employs signs made with the hands and other movements, including facial expressions and postures of the body. It is a language distinct from English – it is not simply English in hand signals – it has its own vocabulary, and its own rules for grammar and syntax.

18.     Under many circumstances, writing does not provide effective communication for a deaf individual. Access to writing generally does not allow a deaf individual to understand what is happening and/or communicate quickly enough to participate in group communications. Moreover, written communications are cumbersome and information that would otherwise be spoken may not be written.

19.     In general, lip reading also is a very difficult and unreliable form of communication for deaf individuals. It is extremely difficult to lip-read English because only a small fraction of the sounds used in speaking are clearly visible on the mouth and many sounds appear identical on the lips. In addition to the difficulties in lip-reading, the ability to accurately

lip-read is greatly affected by the speaker's accent, facial bone structure, facial musculature, facial hair, lighting, distance from the lip reader, and other external factors. In any event, Mr. Hawk cannot read lips.

20. Thus, provision of qualified sign language interpreter services is the auxiliary service necessary to allow deaf individuals who use ASL in BOP's custody and under BOP's supervision to effectively communicate with BOP officials, BOP employees, and medical personnel.

21. BOP, through its policies and practices, failed to provide adequate access to qualified sign language interpreters for Mr. Hawk from the time he entered the prison in February 2015. When Mr. Hawk arrived at FCI Schuylkill, no accommodations were in place to accommodate his being deaf. No interpreter was made available at his prison intake. No procedures had been instituted to allow him to communicate with medical professionals or meaningfully participate in prison activities, meetings, or safety programs as was required under federal law. Mr. Hawk's admission should have been delayed until the all reasonable accommodations and auxiliary aids were in place at FCI Schuylkill.

22. Only after months of complaining to his counselor and after initiating the Administrative Remedies Process did the prison respond, albeit inadequately, to Mr. Hawk's request for a qualified interpreter and access to a video phone. In particular, the prison agreed to make an interpreter available to Mr. Hawk but only with 14 days advance notice, only during very limited hours during the day, and never on weekends. The prison however did not provide Mr. Hawk with his request for access to a videophone.

23. Most prison events are not scheduled with 14 days advance notice. Therefore, this requirement effectively denies Mr. Hawk access to many prison sponsored and prison-approved

events and does not qualify as a reasonable accommodation. By limiting Mr. Hawk's access to an interpreter to a narrow window of time during weekdays and not providing an interpreter for all prison-sponsored or prison-approved events, the prison falls short of meeting its obligation to make each and every prison sponsored or approved activity *readily accessible* to persons with disabilities. Relatedly, even when Mr. Hawk was able to make his request for an interpreter with 14 days advance notice of a prison-sponsored event, the prison would sometimes cancel or suspend the event indefinitely so that it did not have to provide Mr. Hawk with an accommodation.

### i. Interpreters for Medical Services and Treatment

24. BOP is responsible for the medical care of all individuals incarcerated at FCI Schuylkill. Mr. Hawk relies on ASL for effective communication for medical and health care services. After receiving numerous written requests, BOP is aware that Mr. Hawk needs an ASL interpreter for his medical appointments.

25. Nonetheless, BOP still periodically fails to provide an interpreter for Mr. Hawk's appointments and treatments. Furthermore, BOP often schedules Mr. Hawk's appointments only a few days beforehand, leaving Mr. Hawk with insufficient advance notice to request an interpreter himself due to BOP's 14 day requirement.

### ii. Interpreters for Access to Prison Programs

26. BOP provides educational, vocational and therapeutic programs for individuals within its custody. In order to fully participate in these programs like a hearing individual, Mr. Hawk requires an interpreter so that he can understand what is being said by the instructor.

27. BOP has repeatedly denied Mr. Hawk's requests that interpreters be made available at these classes, even when a course was originally required for Mr. Hawk. For

example, Mr. Hawk was told by prison employees that he was required to take certain courses as part of his inmate skills development plan. However, prison staff later stated that if interpreting was not available, then the courses would become recommended and not mandatory.

### iii. Interpreters for Access to Religious Services

28. BOP provides religious services and activities for individuals within its custody, including Jewish prison sponsored programs.

29. After receiving numerous written requests, BOP is aware that Mr. Hawk is a practicing Jew who needs an ASL interpreter in order to meaningfully participate in Jewish religious activities.

30. Since his incarceration began, Mr. Hawk however has not been able to participate in Jewish religious activities hosted by the prison because he has been denied access to an interpreter and the other individuals attending these activities do not understand ASL. The longer he is deprived of meaningful religious connection, the more difficult it is to rebuild that connection and its rehabilitative purposes upon release.

### iv. Interpreters for Access to Prison Proceedings

31. Despite Mr. Hawk's disability, BOP does not automatically provide Mr. Hawk with an interpreter at prison proceedings and meetings. BOP instead requires that Mr. Hawk request an ASL interpreter for any disciplinary proceeding or town hall meeting with the same 14 day advance notice requirement. Given the importance of these meetings for both Mr. Hawk's compliance with prison regulations and his safety while under BOP's custody, BOP is obligated to provide an interpreter for these proceedings and meetings.

32. On several occasions, town hall meetings have been scheduled with insufficient notice for Mr. Hawk's interpreter request to comply with BOP's 14 day notice requirement. In

fact, one town hall meeting was scheduled only a day in advance and another meeting's occurrence was never communicated to Mr. Hawk by any prison staff.

33. BOP's failure to provide an interpreter for official prison meetings has made meaningful participation in these meetings impossible for Mr. Hawk. Furthermore, it has jeopardized Mr. Hawk's safety because he cannot understand critical and timely updates being conveyed verbally at these meetings. For example, in August 2015, there were several meetings called by prison officials to discuss drug-related incidents as well as violent breakouts that occurred at the prison. While Mr. Hawk was provided with a script of one of the prison official's prepared remarks, another official who spoke at length did not provide a script of his remarks to Mr. Hawk. In addition, in October 2015, similar meetings were held but inadequate notice was provided to Mr. Hawk to allow him to even request an interpreter.

### B. *Inadequate Access to Telecommunications*

34. Prisoners in BOP facilities are permitted access to telephones, per BOP Policy 5264.08.

35. Like other inmates, Mr. Hawk wants to communicate by telephone with his family, friends, and attorneys while in the custody of the BOP. The BOP, however, either substantially restricts or completely denies access to appropriate telecommunications devices for deaf prisoners in its facilities, including at FCI Schuylkill.

36. As BOP has recognized, "[t]elephone privileges are a supplemental means of maintaining community and family ties that will contribute to an intimate's personal development." 28 C.F.R. § 540.100. Telephone and other forms of telecommunication are very important to individuals in BOP's custody because they foster the family and community ties that are fundamental to motivate incarcerated individuals to improve themselves and to prepare them

to make a positive transition back to civilian life once their sentence is complete.

37. Because of his deafness, Mr. Hawk is unable to use a traditional telephone. In the outside world he uses a videophone to communicate via telephone using ASL.

38. A videophone is a telephone with a camera and screen for visual communication. It allows ASL speakers to sign with each other between camera screens and have real-time conversations. Communication can also be accomplished by videophone between an ASL user and a hearing, non ASL user through a relay operator who is a qualified ASL interpreter. This process, call Video Relay Service ("VRS"), is toll free for deaf users.

39. A videophone is the most effective telecommunications auxiliary aid for deaf individuals like Mr. Hawk who use ASL as a primary means of communication. It is far superior to communication through older technology such as teletypewriters (TTYs), both because it depends upon ASL skills instead of written skills for communication, and because without a videophone there is no way to contact most deaf individuals outside the institution who no longer own the older technology. Moreover, one cannot place a call to a videophone through TTY.

40. A TTY, on the other hand, is a sixty-year old technology that allows people to send written messages back and forth to each other by telephone. When both users have this equipment, they can communicate directly over telephone lines. When a hearing person does not have a TTY, a Telecommunications Relay Service ("TRS") operator reads aloud the written messages from the TTY user and transcribes the non-TTY user's verbal response. The TTY ultimately is a much more time intensive and less effective communication tool than the telephone. Most deaf individuals no longer have TTYs, and communicate on telephone solely by videophone. A TTY cannot be used to communicate with a deaf person who does not have a TTY.

41. During his incarceration, Mr. Hawk has not been provided with adequate and consistent access to telecommunications. FCI Schuylkill has denied his repeated requests for use of a videophone to communicate with those outside the facilities. While Mr. Hawk has access to a TTY, TTY does not suffice as a reasonable accommodation. No deaf people in the community use it, and TTY machines are a dying technology which are not neither readily available to purchase and/or able get repaired/replaced over time.

### C. *Inadequate and Inconsistent Access to Visual Notifications*

42. As a deaf individual, Mr. Hawk cannot access public address and other audio alerts and announcements available to other inmates. Because Mr. Hawk cannot hear announcements or emergency alerts, BOP must provide him with timely written notifications or access to other visual notifications so that he can receive important updates and/or emergency alerts.

43. Mr. Hawk has not been provided with consistent access to a visual or tactile alarm for emergencies or any other notifications. Mr. Hawk therefore worries about missing important announcements and notifications that are necessary for his well-being and safety. Examples of scenarios where BOP failed to provide Mr. Hawk with any written or visual notice as required under the law include, but are not limited to:

- a fire drill incident where the whole building was evacuated and no prison employees or guards noted Mr. Hawk's absence or searched for him despite providing no notification to Mr. Hawk regarding any evacuation plan for deaf prisoners; and

- a riot gear incident in which 20 officers that were dressed in riot gear evacuated one of the prison buildings without attempting to assist Mr. Hawk or alert him to the events that were occurring.

44. Even in the one respect where the prison attempted to provide for Mr. Hawk's disability, BOP's inconsistent and inappropriate use of the visual notification caused the

accommodation to be ineffective and confusing.

45. Specifically, BOP installed a light with blue covering ("blue light") at either end of the D Range in Camp One building, where Mr. Hawk bunks, and outside the main bathroom in the Administration building as a mean of alerting Mr. Hawk and other deaf inmates when a female guard was present.

46. This light however was rarely used appropriately by the prison staff. On numerous occasions, female prison guards were in the dormitory without activating the "blue light." In other instances, prison officials activated the blue light when no female guard was present, but when a group of prison supervisors was touring the facility, on information and belief, to ensure that inmates were looking their "best" in case of a possible inspection.

47. This inconsistent use of the blue light caused Mr. Hawk to be confused and disoriented regarding his surroundings and condition.

### D. *Inadequately Trained Prison Officials*

48. BOP has also failed to reasonably accommodate Mr. Hawk's disability by neglecting to properly train and/or supervise the prison officials and staff at FCI Schuylkill in how to appropriately interact with deaf inmates. In particular, prison officials' routines and interactions with and/or around Mr. Hawk demonstrate that many officials fail to take Mr. Hawk's disability into consideration, choose to disengage from communicating with him when it is inconvenient to do so, or do not even know about Mr. Hawk's disability.

49. The following examples demonstrate the prison officials' deliberate indifference, apathetic attitude or total ignorance of Mr. Hawk's disability and their duty to communicate with him non-aurally as a reasonable accommodation to ensure his safety and well-being:

- Mr. Hawk was nearly injured when crossing a hallway because he could not hear prison guards pushing a heavy metal cart in that hallway and the guards made no attempt to visually alert Mr. Hawk of the potential danger;

- Mr. Hawk learned after the fact that a guard had been shouting at him for some unknown reason while his back was turned and that the guard only turned around and left upon learning from other inmates that Mr. Hawk was deaf; and

- Mr. Hawk was not notified about changes to several meal times which caused him to miss his opportunity to eat on those occasions.

- Mr. Hawk frequently resorts to writing notes to gain information and is often rebuffed by guards or staff blowing that off and continuing to force him to lipread.

### E.  *Exhaustion of Administrative Remedies*

50. As required under the Prison Litigation Reform Act, Mr. Hawk has fully exhausted the administrative remedies with respect to claims arising from his prison conditions and relief sough in this complaint. In particular, Mr. Hawk has exhausted BOP's four step Administrative Remedy Process, which is described in 28 C.F.R. §§ 542.13 – 542.18.

51. In February and March of 2016, counsel for Mr. Hawk wrote to FCI Schuylkill on Mr. Hawk's behalf requesting that the prison provide Mr. Hawk with reasonable accommodations. These letters were either ignored or rebuffed by prison officials, who declined to take action on these issues outside the Administrative Remedies Process.

52. On July 1, 2016, Mr. Hawk initiated the Administrative Remedy Process by filing an Administrative Remedy Procedure for Inmates Informal Resolution Form ("BP-8.5"). In this form, Mr. Hawk listed the following complaint: "Prison's failure to accommodate my disability by providing a qualified interpreter and access to a videophone." Mr. Hawk also explained how he tried to informally resolve this complaint through two separate letters that his attorneys sent to the prison on his behalf.

53. On July 29, 2016, Mr. Hawk filed a Request for Administrative Remedy ("BP-9") with the Warden of FCI Schuylkill, in which he requested to be provided with an interpreter.

54. On August 5, 2016, the Warden of FCI Schuylkill, R.A. Perdue provided the following response to Mr. Hawk's July 29, 2016 request:

> The institution has awarded a contract to a service which will be providing sign language interpreters. The individual sign language interpreters are in the process of obtaining necessary clearances to begin working on site. Once the interpreters begin working on site, the institution anticipates providing interpreting services as necessary for medical and psychology appointments, educational and religious programs, program review, town hall meetings, and disciplinary proceedings. Interpreting services will be available for these programs and activities when they can be scheduled with sufficient advance notice. In addition you must otherwise be qualified to participate in the programs and activities.

55. Mr. Hawk timely appealed Warden Perdue's response to the Regional Director of the Federal Bureau of Prisons. In his Regional Administrative Remedy Appeal ("BP-10"), Mr. Hawk claimed that Warden Perdue's proposed accommodations are inadequate and any accommodation should have been available when his arrived at the facility.

56. On September 9, 2016, the Regional Director, M.D. Carvajal denied Mr. Hawk's appeal, finding that the Warden had adequately addressed Mr. Hawk's concern.

57. On September 24, 2016, Mr. Hawk filed an appeal of Regional Director Carvajal's response with the Administrative Remedy Section, Office of General Counsel, Federal Bureau of Prisons ("OGC"). In his Central Office Administrative Remedy Appeal ("BP-11"), Mr. Hawk provided the following reason for appeal:

> While the prison has engaged an interpreter, the interpreter is not qualified and has not been made reasonably available. I am required to request an interpreter fourteen days in advance of an anticipated need. This does not enable me to use an interpreter during most appointments at the prison or for most prison activities, which are not generally scheduled that far in advance. Further, the interpreter is only available during exceedingly limited hours during each day and not on weekends making it even more difficult for me to use his services. Additionally, the prison's actions do not provide any remediation for the significant amount

>of time I was forced to go without a qualified interpreter for no justifiable reason. Accordingly my concerns have not been addressed.

58. On January 17, 2017, Mr. Hawk's counsel sent a letter to the OGC to follow up on Mr. Hawk's September 24, 2016 appeal.

59. After receiving no response from the OGC, on March 10, 2017 Mr. Hawk through his counsel filed a formal grievance form with the Director of Equal Employment Opportunity ("EEO"), Department of Justice.

60. On March 16, 2017, Mr. Hawk's counsel received the following response regarding Mr. Hawk's submission of his formal EEO grievance form: "Your letter will be reviewed and if a response or an update is necessary it will be sent to you within 60 business days." Mr. Hawk never received a response from the EEO Director.

### F. *Harm to Plaintiff*

61. Mr. Hawk was unable to benefit fully benefit from any of the meetings, programs and services available at FCI Schuylkill because he could not participate in group discussions and he could not comprehend the class material or religious services. Without an interpreter on most occasions or without a qualified interpreter on some occasions, Mr. Hawk was unable to receive the therapeutic and rehabilitative benefits provided by religious services, exercise classes or the vocational skills provided by FCI Schuylkill.

62. Mr. Hawk suffered physical harm and greater emotional distress, and continues to suffer emotional distress, caused by his inability to participate in prison sponsored or approved activities, communicate with the people around him and the refusal of staff to accommodate his disability.

63. In particular, he has experienced anxiety, fear, depression, humiliation, and

isolation. The possibility that an important notification or emergency alarm would sound and he would be unaware also caused Mr. Hawk additional emotional distress.

64. Furthermore, all of these highly stressful conditions and the prison's continued failure to accommodate for his disability caused him to experience a medical condition and related hospitalization on July 18, 2017.

## V.   CLAIMS FOR RELIEF

### COUNT I:
Discrimination on the Basis of a Disability in Violation of the Rehabilitation Act
(29 U.S.C. §§ 794 et seq. and 5 U.S.C. § 703)

65. Mr. Hawk realleges and incorporates by reference each and every allegation above as if fully set forth herein.

66. Rehabilitation Act provides that no qualified individual with a disability "shall, solely by reason of her or his ability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794(a).

67. Mr. Hawk is deaf, and as such, is a qualified individual with a disability within the meaning of Rehabilitation Act, 29 U.S.C. § 705(20).

68. Mr. Hawk is otherwise qualified to receive informed medical treatment and communicate with medical providers on an equal basis with other prisoners in the BOP, and is eligible to participate in commensurate educational, religious, rehabilitation, vocational, and all other programs and services to others at FCI Schuylkill.

69. BOP is an executive agency within the meaning of 29 U.S.C. § 794(a).

70. The operations of BOP, including the departments, agencies, programs,

instrumentalities at FCI Schuylkill such as Health Services, Psychology Services, Sex Offender Management and Treatment, Drug Abuse Treatment, the Educational Department and its associated programs, Vocational and Occupational Training programs, Intimate Skills Development Initiative, and work programs such as Federal Prison Industries, are "program[s] or activit[ies] conducted by an Executive Agency' within the meaning of Rehabilitation Act, 29 U.S.C. § 794(b)(1)(A)-(B).

71.     At all times relevant to this action, Rehabilitation Act was and remains in full force and effect in the United States and Mr. Hawk has a right to not be subject to discriminate on the basis of his disability by BOP.

72.     The purpose of Rehabilitation Act is to ensure that no "qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794(a).

73.     The Department of Justice's regulations implementing the Rehabilitation Act recognize that activities of its agencies are programs or activities conducted by an Executive Agency of the United State government, and that "the agency shall furnish appropriate auxiliary aids where necessary to afford a handicapped person an equal opportunity to participate in, and enjoy the benefits of, a program or activity conducted by the agency." 28 C.F.R. § 39.160(a)(1).

74.     Auxiliary aids include but are not limited to interpreters and telecommunication devices for deaf persons. 28 C.F.R. § 39.160(a)(1).

75.     The Department of Justice's regulations implementing the Rehabilitation Act additionally mandate that "[i]n determining what type of auxiliary aid is necessary, the agency

shall give primary consideration of the requests of the handicapped person." 28 C.F.R. § 39.160(a)(1)(i).

76. BOP's failure to provide Mr. Hawk with an effective means of communication denied him the same access to BOP's services, programs and activities as the access provided to hearing individuals. BOP intentionally subjected Mr. Hawk to disability-based discrimination in violation of his rights under the Rehabilitation Act, by failing to provide Mr. Hawk adequate access to a qualified ASL interpreter, effective and consistent usage of non-aural notification of emergencies or other important events and announcements, and properly trained staff.

## COUNT II
Violation of the Religious Freedom Restoration Act
42 U.S.C. § 2000bb-2(1)

77. Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

78. Governments may not impose substantial burdens on the religious exercise of institutionalized persons even if the burden results from a rule of general applicability. 42 U.S.C. § 2000bb-1a.

79. As a branch, department, agency, or instrumentality of the United States, BOP is a government within the meaning of the Religious Freedom Restoration Act ("RFRA"). 42 U.S.C. § 2000bb-2(1).

80. The BOP has impermissibly deprived, and continues to deprive, Mr. Hawk of his right to the free exercise of religion, as secured by RFRA, by unlawfully imposing a substantial burden on Mr. Hawk's religious exercise. BOP has done this by failing to provide an interpreter or other means for enabling Mr. Hawk to effectively participate in weekly worship services.

81. Hearing inmates at FCI Schuylkill are able to attend and participate effectively in

religious services.

82. BOP's failure to provide Mr. Hawk with an interpreter to ensure the same level of participation as hearing inmates is not in furtherance of any compelling governmental interest.

83. BOP's failure to comply with RFRA has resulted in harm to Mr. Hawk, and will continue to result in harm to Mr. Hawk, as Mr. Hawk will continue to be in the BOP's custody and will continue to attempt to participate in weekly worship services unless and until BOP is ordered by this Court to make modifications to BOP policies, practices, and procedures pursuant to RFRA.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Mr. Hawk respectfully requests:

A.    The Court adjudge and decree that the actions of Defendant Bureau of Prisons, as alleged herein, violated and continue to violate Mr. Hawk's rights under the Rehabilitation Act and the Religious Freedom Restoration Act.

B.    ENTER such injunctive and/or declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure against the BOP and in favor of Mr. Hawk as it deems appropriate to remedy past violations of the laws of the United States and to prevent future violations of the same, including by ordering BOP to provide at FCI Schuylkill:

- Qualified ASL interpreters during Mr. Hawk's waking hours to enable Mr. Hawk to communicate effectively with medical and mental healthcare professionals, institution staff, educational and vocational instructors, religious leaders, work program managers and coordinators, and others especially during medical appointments, religious events, town hall meetings, disciplinary hearings and any interactions with staff involving alleged violations of prison rules or conduct;

- Effective and consistent usage of non-aural notification of emergencies or other important events and announcements, e.g. a vibrating pager, effective and utilized visual alarms and/or message boards;

- Effective training program to instruct prison employees on how to appropriately interact with and be sensitive to the needs of deaf individuals such as Mr. Hawk.

- Access to Video Remote Interpreting (VRI) for usage when an interpreter cannot feasibly be brought in; and

- Equal and full access to appropriate and effective telecommunications devices for the deaf, such as full and equal access to a videophone.

C. Judgment be entered awarding Mr. Hawk damages against Defendant in an amount appropriate to the evidence adduced at trial, including but not limited to, damages for the personal injuries suffered by Mr. Hawk as the result of the BOP's violations of law.

D. Judgment be entered against Defendant in favor of Mr. Hawk for the costs of litigation, including reasonable attorneys' fees and costs under 28 U.S.C. 2412(d)(1)(A).

E. The Court retain jurisdiction of this matter until Defendant demonstrates that it has fully complied with the orders of this Court, and that there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction and

F. The Court award such further relief that the Court deems appropriate.

Respectfully Submitted,

Date:   March 6, 2018

*/s/ Theodore R. Flo*
Constantinos G. Panagopoulos
Theodore R. Flo
Tiffany B. Gelott
BALLARD SPAHR LLP
1909 K Street, NW, 12th Floor
Washington, DC  20006-1157
Telephone: (202) 661-2200
Fax: (202) 61-2299
cgp@ballardspahr.com
flot@ballardspahr.com
gelottt@ballardspahr.com

*Attorneys for Plaintiff Samuel Hawk*